IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

RITCHIE WELLS                                                    PLAINTIFF

V.                              Case No. 12-CV-6099

BRADY PADDOCK                                                  DEFENDANT

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed by Defendant Brady Paddock. (ECF No. 22). Plaintiff Ritchie Wells has responded. (ECF No. 26). Defendant has filed a reply. (ECF. No. 33). The matter is ripe for the Court's consideration. For the reasons explained below, Defendant's motion is granted.

## I. BACKGROUND

Defendant Brady Paddock formed 101 Central, LLC, to purchase land at 101 Central Avenue, Hot Springs, Arkansas, for the purpose of operating a restaurant and bar on the property. Paddock, as managing member of 101 Central, LLC planned to remodel the existing building on the property. Paddock began negotiating with Kevin Mosley, who was involved in the restaurant business in Hot Springs, and proposed that Mosley complete construction on the building and lease it for the purpose of operating a restaurant and bar at the location. Mosley formed Skybox Sports Bar N Grill, LLC, and entered into a lease agreement with 101 Central on June 30, 2011. A few months later, Paddock became aware that Mosley was having financial trouble. Mosley explained to Paddock that Mosley would not be able to complete the interior construction of the building. Paddock and Mosley agreed that Paddock would release Mosley/Skybox from the lease agreement, and a lease termination agreement was executed. Paddock/101 Central then negotiated an agreement with Fat Jack's restaurant to finish the project and open a bar and restaurant at 101 Central Avenue. Fat Jack's is

currently open and operating at the location, and Paddock/101 Central receives rental income from Fat Jack's.

The dispute in this case centers around Plaintiff Ritchie Wells' relationships with Paddock and Mosley/Skybox. Paddock claims that Wells appeared to be Mosley's assistant and construction foreman, although Paddock states that he communicated with Wells during the Skybox negotiation with Mosley. Mosley describes Wells as an employee of Skybox who was in charge of construction. Mosley maintains that Skybox paid Wells in full for any work that he performed and denies that he had a partnership agreement with Wells relating to Skybox. Mosley, however, states he told Wells that, in the future, he would give Wells a chance to buy in as a co-owner of Skybox if the restaurant opened and performed well for a few years and if Wells helped generate business for Skybox.

Wells claims that he was the one that brought Mosley into the negotiation with Paddock. Wells asserts that he and Mosley were business partners and that they had an oral partnership agreement. The agreement, in part, was that Mosley would contribute the initial capital to the business while Wells would contribute his time, skill, labor, and personal connections to get the building ready and restaurant open. Mosley and Wells were to split all future income equally once the restaurant began making

According to Wells, he did not sign his name on any of the lease agreements or on the Skybox LLC papers because of fears that, if his name was included, it would jeopardize Skybox's ability to obtain a liquor license. Apparently, Wells had problems with bars and restaurants that he had previously owned. It was Wells' understanding that, once Skybox obtained a liquor license and opened, his name would be added to the lease agreement and all necessary papers and accounts. Wells believes that Paddock was aware of this plan and the partnership agreement between Wells

and Mosley.  Wells claims that Paddock negotiated every aspect of the deal with him, including the lease pricing option, rental payments, and term of years in the lease agreement.  Paddock also ran Wells' credit score and did a background check on Wells before the lease agreement was signed. The parties dispute whether Wells and Mosley were business partners in Skybox; however, this dispute and other factual disputes in this case against Paddock are not material to the outcome.

Wells brings two claims against Paddock in this lawsuit: (1) tortious interference with a business expectancy and (2) unjust enrichment.  Paddock asserts that he is entitled to summary judgment on both claims.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Under this standard, the inquiry is not whether the evidence favors one side or the other, but "whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  When considering a summary judgment motion, the Court "must view the evidence 'in the light most favorable to the nonmoving party.'" *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 445 (8th Cir. 2008) (quoting *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997)).  To defeat a motion for summary judgment, however, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." *Bell*, 106 F.3d at 263 (8th

Cir. 1997).  "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010).

## III.  DISCUSSION

First, Wells alleges that his business expectancy in Skybox was eliminated as a direct result of Paddock's actions.   Second, Wells alleges that Paddock was unjustly enriched by the improvements made to the building by Wells and that he should be compensated for the work that he did on the building.

### A.  Tortious Interference with a Business Expectancy

Tortious interference with a contractual relationship or business expectancy is intentional and improper conduct by a person that induces or otherwise causes a third person not to perform a contract.  *Gunn v. Farmers Ins. Exchange*, 2010 Ark. 434, at 7, 372 S.W.3d 346.  Here, Wells argues that by terminating the lease agreement with Mosley/Skybox without contacting Wells, Paddock tortiously interfered with Wells' business expectancy that he and Mosley would operate a restaurant and bar at 101 Central Avenue.

The specific elements of tortious interference under Arkansas law are as follows: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *Skalla v. Canepari*, 2013 Ark. 415, at 11-12, ___ S.W.3d ___.  The conduct of the interfering party must also be improper.  *Id.*; *Baptist Health*

*v. Murphy*, 2010 Ark. 358, at 15, 373 S.W.3d 269, 281-82.    Here, even if there are material facts in dispute regarding the core elements of Wells' tortious interference claim, the claim still fails because Wells cannot show that Paddock's conduct was improper.

   In determining whether an actor's conduct is improper, consideration should be given to the following factors: (1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and (6) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.  *Id.* at 15-16, 373 S.W.3d at 282.  The Arkansas Supreme Court often recite these six factors in its opinions; however, this Court is unaware of any cases that offer guidance as to the application of the factors.  Generally, in cases where the Arkansas Supreme Court has determined interfering conduct to be improper, it has also found that the conduct was unlawful or independently tortious.  *See Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006) (upholding the trial court's finding that Baptist's conduct violated the Arkansas Deceptive Trade Practices Act and that this violation satisfies the impropriety requirement of a tortious interference claim); *Stewart Title Guaranty Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005) (finding that defendant violated the Real Estate Settlement Procedures Act (RESPA) and holding that the jury was justified in finding that Stewart's behavior was improper); *Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark 270, 58 S.W.3d 324 (2001) (finding that a party acted improperly when he engaged in fraudulent behavior consisting of invalid and forced property transfers).  The Court, however, notes that there is no specific requirement that, for conduct to be

deemed improper, it must also be unlawful or independently tortious.  *See Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 14, 969 S.W.2d 160, 164 (1998).

In this case, there is no evidence of any improper motive on the part of Paddock, who terminated the lease with Mosley, when Mosley informed Paddock that he was having financial difficulties and that he would not be able to complete the interior construction of the building. Mosley claims that he voluntarily executed the Lease Termination Agreement with Paddock/101 Central because it was in the best interest of Skybox since Mosley did not have adequate funds available to complete construction, decorate the building interior, buy or lease kitchen equipment, hire staff, and purchase food and alcohol.  Wells offers no evidence to refute Mosley's explanation. In fact, Wells acknowledges that Mosley told him some time after signing the Lease Termination Agreement that Mosley did so because he was out of money.

The nature of Paddock's conduct is that he executed a valid lease termination agreement. His motive was to protect his immediate financial interests.  Mosley agreed to the lease termination. There is no evidence that Paddock executed the lease termination agreement for any other reason than to protect his financial interests, and the Court cannot say that this conduct is improper under Arkansas law.  Thus, Paddock is entitled to summary judgment on this claim.

## B.  Unjust Enrichment

"To find unjust enrichment, a party must have received something of value to which he was not entitled and which he should restore."  *Sparks Regional Medical Center v. Blatt*, 55 Ark. App. 311, 317, 935 S.W.2d 304, 307 (1996).  Further, "there must be some operative act, intent, or situation to make the enrichment unjust."  *Id*.  Here, Wells asserts that he conferred benefits on Paddock/101 Central through construction work performed and that Paddock/101 Central is not

entitled to these benefits.  Wells asserts that the unjust act is that Paddock used "questionable means" to terminate the lease agreement with Mosley.  However, as discussed earlier, Paddock's termination of the lease agreement is not considered improper conduct under Arkansas law.  Similarly, there is no evidence of an operative act, intent, or situation on the part of Paddock to make the enrichment unjust.  Any improvements made to the building were done so as part of a valid contractual agreement between Paddock/101 Central and Mosley/Skybox.

Moreover, Arkansas courts will apply the unjust enrichment theory only upon a showing that the person who performed the work had a reasonable expectation of being paid for it.  *Id*.  Here, the contractual agreement regarding interior improvements to the building was between Paddock/101 Central and Mosley/Skybox, and Wells was not a party to this contract.  Mosley maintains that he has paid Wells in full for the work Wells performed at the building, and Wells does not dispute that Mosley paid him. Thus, Wells had no reasonable expectation of payment from Paddock.  Because Wells has offered no evidence to show that he had a reasonable expectation of payment from Paddock or that the enrichment was unjust, Paddock is entitled to summary judgment as a matter of law on the unjust enrichment claim.

## IV.  CONCLUSION

For the reasons stated above, the Court finds that Paddock's Motion for Summary Judgment (ECF No. 22) should be and hereby is **GRANTED**.  Accordingly, Wells' complaint is **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED, this 13th day of November, 2013.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

-7-